

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:JGH/JAM
F.#2020R00001

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 13, 2020

By ECF

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Daniel Jou
      Magistrate Docket No. 20-368

Dear Judge Levy:

   Later today, defendant Daniel Jou is scheduled to be presented before Your Honor on the above-referenced complaint. For the reasons set forth below, the government respectfully submits that the Court should enter a permanent order of detention because the defendant presents a danger to the community and a risk of flight.[1]

I.  The Offense Conduct

   On May 13, 2020, the government filed a one-count complaint in the Eastern District of New York charging the defendant with receipt and possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k). The defendant is a 40-year old American citizen with no adult criminal history.

   As described in the complaint, in or about April 2020, Jou was introduced to an undercover member of law enforcement ("the UC") by his co-defendant, Joseph Miner.

---

[1] Detailed herein are a proffer of the relevant facts and a discussion of the applicable law pertaining to the pretrial detention of the defendant. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at a detention hearing or trial. Where the content of statements, documents, or written communications are described herein, they are done so in pertinent part and in sum and substance, except where quoted or otherwise indicated.

Jou believed that the UC was an unlicensed firearms dealer and sought to purchase multiple weapons and ammunition. Jou participated in multiple meetings with the UC and Miner, in addition to communicating with the UC directly over an encrypted messaging platform.

On or about April 26, 2020, Miner and Jou met with the UC in the lobby of a hotel in Queens, New York. This meeting was recorded. During the meeting, Jou stated that he wanted to purchase three 9mm semi-automatic pistols, namely, a Beretta M92FS, a Springfield 1911, and a Glock 19. The three discussed pricing, and both Miner and Jou indicated that they had thousands of dollars in cash on hand and were ready to purchase the weapons that evening. The UC informed Miner and Jou that he did not presently have the firearms and that a second meeting, possibly the following weekend, needed to be scheduled to finalize the purchase. Both Miner and Jou expressed interest in buying ammunition from the UC, and Miner indicated that he was interested in buying an assault rifle in the future when he had more money available. The UC stated that he had several assault rifles available at a price point that Miner could afford, including a "ghost" AR-15 with a "suppressor" attached and a Colt M4, as well as large-capacity magazines.[2]

At various points in the conversation, the UC informed both Miner and Jou that, given the illegal nature of the transaction, the "serial numbers" on the weapons had been "cleaned off." Miner suggested that further communications be conducted over an encrypted internet-based messaging platform and gave the UC his username. Jou also gave the UC his username. At the conclusion of the meeting, both Miner and Jou reiterated that they were "eager" to buy, had the money, and were "ready today."

The following day, Jou contacted the UC via the aforementioned encrypted messaging platform and confirmed that he wanted to purchase the firearms discussed at the meeting. Specifically, Jou asked "can we go over the list[?]" Jou confirmed that he wanted the firearms discussed at the prior meeting, including "1911 9mm and glock 19 [and] M92 elite LLT/w trigger job & Opt. Performance Bar." Jou also expressed interest in the AR-15 the UC had mentioned, asking "what is the nicest AR available," but the UC informed him that Miner had already decided to purchase it. The UC told Jou that he had other assault weapons available. Jou responded that he was "looking for a light civilian tactical version…lightweight…on the higher end." The UC informed Jou that he would have options for Jou to choose from, and Jou responded that he "almost always go[es] with the upgraded version."

---

[2] A "ghost gun" is a firearm that has been assembled from different parts, none of which contain a serial number or identifying markings, thereby making them difficult for law enforcement to trace. A "suppressor," more commonly known as a "silencer," is a muzzle device that reduces the noise and flash when a gun is fired.

In subsequent messages, Jou asked about several other handguns. Jou also frequently stated the need for the UC to meet his order and specifications exactly, and was disinterested when the UC proposed substitute firearms if the guns Jou requested were unavailable. In total, Jou discussed obtaining at least eight distinct firearms from the UC.

During their exchange over the encrypted messaging platform, the UC again informed Jou that the "serial" number had been "cleaned off [the firearms] so no trace."

On May 12, 2020, Miner and Jou met the UC and a second undercover at the same hotel in Queens, New York to consummate the deal. Miner purchased an AR-15-style ghost gun, which came equipped with a silencer, a Mossberg 500 shotgun, and an M&P "Shield" model 9 mm semi-automatic pistol. The shotgun and the pistol had their serial numbers obliterated. Jou purchased a fully automatic Colt M4 assault rifle, which was also equipped with a silencer, and a Glock 19 9 mm semi-automatic pistol that had its serial number obliterated. The two also purchased ammunition and two high-capacity magazines for their respective assault weapons. During the meeting, Jou stated that he would like to purchase additional firearms from the UC at a later date.

## II. Legal Standard

Under the Bail Reform Act, Title 18, United States Code, Section 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) (a judicial officer "shall" order detention if "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following factors to be considered in the detention analysis: (1) the nature and circumstances of the offenses charged, including whether the offense is a "crime of violence"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

The Second Circuit has held that crimes involving the mere possession of firearms are inherently dangerous and constitute crimes of violence under the Bail Reform Act. United States v. Dillard, 214 F.3d 88, 96 (2d Cir. 2000). In Dillard, the Second Circuit observed that:

> Firearms are instruments designed for the use of violent physical
> force, whether legal or illegal. Apart from use for target
> practice in sport, firearms have no functional utility other than to
> threaten or cause harm to persons, animals, or property…
> [F]irearms are conventionally regarded as essential equipment
> of criminals engaged in violent crime.

214 F.3d at 93. Dillard also recognized that silencers are "conventionally regarded as…equipment of criminals engaged in violent crime." Id. In applying Dillard, district courts have found that 18 U.S.C. § 922(k) qualifies as crime of violence under the Bail Reform Act. See, e.g., United States v. Munlyn, 607 F. Supp. 2d 394, 399 (E.D.N.Y. 2009) ("possession of a gun by its nature gives rise to a risk of its use in violence"); United States v. Escobar-Gonzalez, 05-CR-063 (GAG), 2005 WL 459643 at *1 (D.P.R. 2005).

As discussed below, the Bail Reform Act factors weigh heavily against pretrial release.

III.    The Court Should Enter a Permanent Order of Detention

The factors to be considered in the detention analysis show that Jou presents both a significant danger to the community and a substantial risk of flight if released on bond. Accordingly, the Court should enter a permanent order of detention pending trial.

   A.    The Nature and Circumstances of the Offense Charged and the Danger to the Community Posed by Release

The charged offense is serious and demonstrate that the defendant is an acute danger to the community if released.

With respect to the offense charged in the complaint, the defendant purchased a fully-automatic assault rifle, equipped with a silencer and a high-capacity magazine, a semi-automatic pistol with an obliterated serial number, and ammunition for both weapons. The defendant's communications with undercover officers make clear that he was well aware that the serial numbers had been removed and the purpose for doing so: to anonymize the weapon, its illicit source and its end user. As such, "the mere possession of such weapons…presents a substantial risk of physical injury to others." Escobar-Gonzalez, 05-CR-063 (GAG), 2005 WL 459643 at *1 (citing United States v. Ballantine, 4 F.3d 504, 507 (7th Cir. 1993) and United States v. Horodner, 993 F.2d 191, 193 (9th Cir. 1993) and noting that possession of a firearm is a continuing offense where the "risk of harm to others remain[s] present throughout their commission"). Thus, Jou's possession of these items – standing alone – provides clear and convincing proof that he should be detained pending trial. See United States v. Rivera, 95-CR-198 (FB), 1995 WL 302456 (E.D.N.Y. April 28, 1995) (seizure of a loaded, defaced pistol, a .22 caliber revolver, two silencers, assorted clips

and ammunition, and drug paraphernalia from defendant's residence established by clear and convincing evidence that there is a serious risk that the release of defendant would endanger the safety of another person or the community).

While the government does not currently have evidence as to Jou's motive in acquiring these weapons, his criminal intent in doing so is clear from the number and nature of the weapons he purchased, as well as the context in which he purchased them. As described in the complaint, Jou actively and repeatedly solicited the UC – whom he believed to be an illegal firearms trafficker – to purchase these weapons, rather than acquiring them through lawful channels. Relatedly, it defies common sense why Jou would need multiple firearms, including an assault weapon, for any "legitimate, non-violent" purposes. Escobar-Gonzalez, 05-CR-063 (GAG), 2005 WL 459643 at *2 (D.P.R. 2005) (following Dillard and finding that, "[a] conglomerate of such illegal lethal weapons and paraphernalia can only suggest that their possessor (the defendant) intended to use them, along with other persons, to commit a dangerous and deadly act…[s]imply put, this Court cannot fathom any legitimate, non-violent use for these weapons."). Indeed, the sheer number and specificity of the weapons the defendant sought to acquire suggests he may have intended to transfer some of them to third parties.

In sum, the offense conduct alone demonstrates that Jou is a grave danger to the community that no set of release conditions can mitigate.

B. The Weight of the Evidence

The weight of the evidence in this case is overwhelming. The defendant was caught on video and audio surveillance buying and receiving a firearm with an obliterated serial number as well as a fully-automatic assault weapon. Moreover, the defendant's multiple meetings and communications with the UC, which are summarized extensively in the complaint, are recorded on audio and/or video surveillance, as well as being preserved in text messages. These recordings clearly show Jou's predisposition and eagerness to commit the charged offense. As such, the strength of the case against the defendant gives him a significant motive to flee rather than be convicted at trial. See 18 U.S.C. § 924(a)(1)(B).

C. The Defendant's History and Characteristics

Jou's criminal history reveals several sealed arrests, one of which appears to be firearms-related. While the government is presently unaware of the circumstances underlying these arrests, their mere existence only exacerbates Jou's risk of flight and danger to the community.

IV. Conclusion

For all of the foregoing reasons, the defendant should be detained pending trial. The defendant is charged with a serious offense, and the facts surrounding that offense

5

suggest the defendant's willingness to commit even more serious crimes. The government respectfully submits that no condition or combination of conditions will assure the safety of the community, the defendant's return to court, or his compliance with the Court's directives, and the Court should thus enter a permanent order of detention pending trial.

    Respectfully submitted,

    RICHARD P. DONOGHUE
    United States Attorney

By:   /s/ Josh Hafetz
    Josh Hafetz
    Artie McConnell
    Assistant U.S. Attorneys
    (718) 254-7000

cc:    Clerk of Court (by ECF)